UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

RICHARD TAUS,

        Petitioner,

      v.                     No. CV 02-4492 (JBW)

DANIEL SENKOWSKI, Superintendent of
Clinton Correctional Facility,

        Respondent.

----------------------------------------------------------------x


## AFFIRMATION IN REPLY TO RESPONDENT'S ANSWER AND MEMORANDUM OF LAW


Docket No. CV 02-4492 (JBW)


Richard Taus
Petitioner, Pro Se
Clinton Correctional Facility
1074 Cook Street, PO Box 2001
Dannemora, New York 12929


Date Submitted: November 17, 2003

## TABLE OF CONTENTS

Respondent's Affidavit...........................................1

Statement of Facts...............................................5

Rebuttal.........................................................5


Ground I v. Point I..............................................7

The net effect of the suppressed "Brady" materials raises a reasonable probability that its disclosure would have produced a different result at trial. Petitioner's Constitutional right to a fair trial mandated by the due process clause of the Fifth Amendment to the U.S. Constitution as applied to the states by the Fourteenth Amendment, to his conviction cannot stand and he is entitled to a new trial.

Ground II v. Point II...........................................14

Petitioner's Constitutional right to testify on his own behalf was impermissibly abridged by the state court's handling of the "Sandoval" hearing.

Ground III v. Point III.........................................19

Petitioner's Constitutional right to a fair trial was abridged by the trial court's continuous degradation of defense counsel.

Petitioner's Points IV, V, IV v. Respondent's Point V ..........23

Petitioner's Constitutional right to a fair trial was denied as a result of Juror Misconduct, Outrageous Government Conduct, and Prosecutorial Misconduct.


Conclusion

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____x

RICHARD TAUS,

        Petitioner,


        v.                  No. CV 02-4492 (JBW)


DANIEL SENKOWSKI, Superintendent of
Clinton Correctional Facility,

        Respondent.

_____x


## PETITIONER'S MEMORANDUM OF LAW
## In Rebuttal To Respondent's Answer.

Respondent's Affidavit.

      Beginning with the Respondent's Affidavit, there are serious errors, misstatements and mischaracterizations of the facts in this case. Referring to Respondent's Affidavit at page (p.) 5, paragraph (par.) 8, Respondent states, "2) petitioner's claim that he was precluded from calling certain witnesses was not supported by the record." This is untrue. At every opportunity, the trial Judge Edward Baker refused or delayed calling of defense witnesses as reflected in the trial record: (a) Defense request to call the prosecution detectives as witnesses was denied, trial transcripts hereafter referred to as T (T.21-22); (b) Defense request to call Robert Guggenheim's mother and Howard Gilbert, Camp Director, was denied. Both of whom would have refuted prosecution witness Robert Guggenheim's statements (T.2150) (Defense asked for a missing witness charge concerning Guggenheim's mother which was also denied (T.2241); (c) Defense

1

request to call Taus' sister was denied (T.2236-37); (d) Defense request to call Jack Walsh was delayed, necessitating Walsh's return on several days to the Courthouse; (e) Defense request to call FBI Supervisory Special Agent Ron Mahaffrey, who interviewed prosecution witness David MacFarland and was an FBI investigator in this case, to explain the missing Rosario and Brady materials, was denied (T.1606); (f) Defense request to call ADA Joseph Onorato of the Nassau DA's Office, who initially handled this case to explain the missing Rosario and Brady materials in the DA's possession, was denied (T.1616-17); etal.

Furthermore in Respondent's Affidavit, at p.6, par. 1 misstates the following: "4) petitioner failed to identify any documents constituting Rosario or Brady material that was not turned over to the defense." This is a total misrepresentation and completely untrue. Such materials were specifically requested and identified as reflected in both the trial transcripts (T.1534 through 1606, etal.) and in subsequent appeals, especially in petitioner's C.P.L. 440 Motion at Point II.

As to the remaining assertions at p.5, par. 8 and continuing to p.6, the prosecution responses were untrue, to wit: 1) Petitioner was denied a fair trial and effective assistance of counsel which was preserved for appellate review; 2) As noted supra; 3) The trial court's Sandoval ruling was not a proper exercise of discretion and that resulted in harmful error; 4) As noted supra; 5) The trial court incorrectly denied petitioner's motion to vacate judgment; 7) Petitioner's claims of prosecutorial misconduct were preserved and with merit; and 8) Petitioner's sentence was certainly not commensurate and was excessive.

2

At p.6, par. 9, it should be noted that the Appellate Division failed to consider the affidavit of Juror Caroline Lewis which was submitted pursuant to C.P.L. 330 to set aside the verdict. Juror Lewis was "...someone with personal knowledge of the facts essential to support the demand for the relief requested." Juror Lewis' affidavit was part of petitioner's C.P.L. 330 Motion. Further in the last sentence of par. 9, the Appellate Division erroneously concluded without any regard to the evidence and arguments presented by petitioner that the "remaining contentions are either unpreserved for appellate review, without merit, or constitute harmless error." Such a sweeping decree, clearly does reflects that the Appellate Division did not delve into any of the petitioner's points or contentions, disregarding the evidence presented on appeal and in the trial transcript.

At p.6, par. 10, the Respondent is disingenuous referring to one FBI document, the FBI interview report of Lucy Moore (mother of Raphael Ortiz) since there were numerous missing documents that were specifically identified and requested by the petitioner at trial (T.1572-77). The Respondent incorrectly argued that this document was not before the Court. Again, the trial transcript (T.1586-87) shows that it was missing and never turned over to the defense. Further according to the FBI's own letter to the District Attorney and later acknowledgement faxed to the defense, that document was delivered to the Nassau District Attorney's Office (T.1570-71), along with other documents never turned over to the defense.

At the bottom of p.7 in footnote 6, the Respondent proposes that "The report was obtained from the F.B.I., by the undersigned, during the preparation of the prosecution's responsive brief..." One can only wonder why just that specific document was included in the Respondent's Appellate brief to the defense, without any of the other requested documents.

3

Contrary to Respondent's p.8, par. 14 statement as noted above, the FBI report concerning an August 26, 1988 interview of Lucy Moore is but one of several documents not provided to the defense prior to or during trial. The prosecution witnesses' testimonies during the cross-examination at trial showed they were coerced into making false statements and that many of them had initially denied any wrongful conduct on the part of petitioner. The missing documents would have served to, at least, impeach their credibility if not establish that there was no wrongful conduct by the petitioner. Furthermore, those missing documents would have shown that several of the witnesses were mentally incompetent or emotionally disturbed a condition that predated petitioner's acquaintance with them. As a result, those witnesses could not properly perceive or recall events. And it is the petitioner's contention this became evident by the abusive and coercive tactics employed against these young and impressionable witnesses.

Petitioner's claim has been consistently presented to appropriate state courts. Respondent's assertion that the District Attorney's Office did not possess these documents prior to the trial belies the FBI's own acknowledgement that they did. The further assertion (at p.9, par.14) that only the FBI report on Moore was Brady material, dismisses the other documents and their impact upon the trial.

4

## STATEMENT OF FACTS

Petitioner is not seeking to re-argue the factual section of the Respondent's briefs. Petitioner suggest that this Honorable Court refer to the record before it and as presented by the Petitioner in the Appellate Division and subsequent brief to the Court of Appeals, including petitioner's extensive "Letter of Reconsideration" to the Court of Appeals. This will provide the Court with an accurate description of the record and the facts relevant to this case.

Petitioner believes that all relevant documentation regarding the record is before the Court; and if the Court desires additional information that can be provided by Attorney David M. Green or the petitioner.

## REBUTTAL

Under the Antiterrorism and effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), a federal court may not grant habeas corpus relief to a state prisoner on a claim that was adjudicated on the merits in state court proceedings, unless the adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of evidence presented to the state court proceeding.

It is the Petitioner's belief, _Ground I_, that the net effect of the suppressed _Brady_ material raises a reasonable probability that its disclosure would have produced a different result at trial. The petitioner's constitutional right to a fair trial mandated by the due process clause of the Fifth Amendment to the Constitution, as applied to the states by the Fourteenth Amendment, was violated and this conviction cannot stand.

_Ground II_. Further, Petitioner's claim concerning the correctness of the trial court's _Sandoval_ (_People v. Sandoval_, 34 N.Y.2d 371 [1974] ruling presents a federal constitutional issue. The trial court's erroneous ruling deprived Petitioner of his right to testify on his own behalf.

_Ground III_. Further, Petitioner's constitutional right to a fair trial was abridged by the trial court's continuous degradation of defense counsels, making their efforts ineffective.

_Ground IV, V, VI_. Further, Petitioner's right to a fair trial was denied by Jurors' Misconduct, Outrageous Government Conduct and Prosecutorial Misconduct.

## GROUND I v. POINT I

The record is quite clear that there were several documents in the possession of the District Attorney's Office prior to the trial and never turned over to the defense **Brady v. Maryland**, 373 US 83, 83 S.Ct. 1194 (1963). These specifically identified and requested documents were exculpatory in nature and never provided by the prosecution **United States v. Agurs**, 427 U.S. 97, 106 (1976).

Presented with Petitioner's Ground I, the Respondent now tries to evade the Point by falsely claiming that there was a failure to exhaust available state remedies in regard to the prosecution's failure to turn over the **Brady** materials. At least, from the Respondent's own Point I, it now appears that even they consider the materials to be **Brady** in nature. At no time did the trial record ever indicate that those materials were not in the hands of the prosecution. The Respondent's assertion that they did not have the materials is contrary when considering the FBI own acknowledgement that they were given them (T.1570-71, 1586-87).

Concerning some of the missing **Brady** material that were requested at trial, even the Assistant District Attorney, Kenneth Littman, who prosecuted the case, stated "That this information was withheld for some period of time...by the FBI. And that it was only when the Attorney General of the United States' help was enlisted, that that information was given" (T.1583). And that information was given prior to the trial, but never turned over to the defense **U.S. v. Feola**, 651 F.Supp. 1068, 875 F.2d 857; also **Moore v. Illinois**, 408 US 786, 92 S.Ct. 2562).

7

The trial and appellate records are unambiguous, that the materials [including the FBI report dated August 26, 1988] were specified. In fact, certain documents were turned over after a laborious and heated exchange between the prosecution and the defense during a morning court session. It was the Deputy District Attorney, Barry Grennan, who then entered the fray (T.1551-52) At that, and at other times, the defense again and again specifically requested missing materials known to be in the hands of the District Attorney's Office. [With respect to Ground III, Judicial Bias, the trial Judge, Edward Baker, made the outrageous comment when the defense noted that the District Attorney possesses undisclosed **Rosario** and **Brady** materials, "Then you (defense) can get a reversal if he is convicted...I'm not going to do it" (T-1537).]

Indeed, the Respondent's assertion, that the FBI report dated August 26, 1988 was never raised in the appropriate state forum, belies the fact that it was specifically identified and requested at trial, and again during the New York State C.P.L. 440 Motion before a trial court, among other issues. Requests were made for that and other missing **Brady** and **Rosario** materials. The New York Courts chose to ignore Petitioner's pleas and deemed them either without merit or harmless error.

The four criteria noted in **U.S. v. Meros**, 866 F.2d 1304, 1308 (11th Cir.) existed in this case: (1) the state possessed evidence favorable to the petitioner; (2) petitioner did not possess the evidence, nor could he have obtained it with any reasonable diligence without disclosure to the state; (3) the prosecution suppressed the favorable evidence; and (4) had the

evidence been disclosed, there is a reasonable probability that the outcome of the proceedings would have been different (see also **U.S. v. Zagari,** 111 F.3d 307, 320 (2d Cir. 1997); **U.S. v. Payne,** 63 F.3d 1200, 1208 (2d Cir. 1995).

Interestingly, the Respondent dwells only on the missing FBI report dated August 26, 1988 and ignores the other requested materials as previously noted: an October 26, 1988 FBI interview with the Moore Family (Witness Ortiz), three interviews with Anna Schulze (Witness-MacFarland), an October 17, 1988 interview with Therapist Denise Adcock and Jessie Pulliam (MacFarland), an October 18, 1988 interview with Therapist Wayne Welch (MacFarland), Physician Estelle Robinson's report (who interviewed witnesses on October 25, 1988, a May 3, 1988 interview with a minister, references to other interviews of Witness Ortiz, notes taken by Nassau Police Detective Doppman, etal., all of which the trial ADA denied having in his possession.

Despite Petitioner's diligence and repeated attempts to secure said documents, the Federal Bureau of Investigation (FBI) has not provided any of its reports or interviews to the Petitioner without said documents being heavily redacted or deleted (due to "National Security Concerns" from disclosure). As noted in Petitioner's C.P.L. 440 Motion, Exhibit IX therein, Petitioner filed for those documents under the Freedom Of Information Law (FOIL) without success.

Furthermore, upon cross-examination of prosecution witnesses many disturbing details were obtained concerning excessive pressure and coercion, along with trial rehearsal of the young

9

witnesses, many of whom memorized the "script" given to them by the ADA. The record reflects that nearly every witness told the investigating authorities that nothing happened between them and the petitioner. Yet in the end, the overbearing conduct of those officials produced contradictory testimonies.

As if to suggest that other evidence is compelling in this case, Respondent points out the alleged statements supposedly given by the Petitioner. This Court has only to note that there is a great question as to their authenticity since, of the two alleged statements, both are in different handwritings. Even if the Respondent successfully argues that the statements are from the Petitioner, this Court must raise the question as to what happened during the lengthy interrogation of FBI Special Agent Richard Taus, events that resulted in his inability to write even simple statements, if they are true. Further, the Respondent offers suggestions and innuendoes concerning what they term other evidence. Remarkably such notions are the product of the present Attorneys for the Respondent whom never were at the trial, yet proffer suggestions which cannot be considered accurate or truthful.

No where in the trial or appellate records did the
Petitioner ever admit taking nude photographs of the witnesses.
Perhaps, the Respondent incorrectly relies upon the obscure and
fraudulent statements provided by the FBI; but at no time, did
the Petitioner ever say he took any nude photographs. The Court
is reminded that the Petitioner has consistently proclaimed his
innocence which is the very reason he went to trial and has so
arduously pursued his appeals. Further, the record shows that
Witness Raphael Ortiz had keys to Petitioner's house and knew how
to operate cameras. It is that fact which the defense tried to
introduce during Ortiz' cross-examination which was denied by
Judge Baker.

Insofar as Petitioner's request for his FBI employment,
which the record shows was supplied to prosecution witnesses,
Drs. Larry Seigel and Barbara Kirwin, these records were never
turned over to the defense. Obviously, Petitioner's FBI "Time &
Attendance" records would support his whereabouts on the dates
alleged in the indictment. And in fact, such was the case when
the defense called for Petitioner's US Army Reserve records.
Those Army records, along with alibi witnesses (CWO Jack Walsh
and COL Harvey Bartash) clearly proved that Petitioner was not at
any crime scene. With those records, the jury foundd the
Petitioner innocent of, at least, nine (9) counts. It goes
without speculation that the FBI records were given to the
District Attorney's Office and used by prosecution witnesses (in
their own testimonies), but never turned over to the defense.

[Subsequent FOIL requests to the FBI for those records (and
others) met with the response from the Bureau that "they were

11

temporary records and since destroyed." It must be pointed out that the FBI would never destroy any records given a criminal prosecution; unless of course malfeasance was involved.]

Respondent's Point I and other points are redundant in nature, reinterating over and over again materials previously covered in their affidavit and memorandum of law. Such repetition does not make the record more accurate or truthful. For instance, Respondent alleges that they did not possess any psychiatric records on Witness MacFarland and the fact that MacFarland testified that he has a mental condition apparently, from the Respondent's viewpoint, absolved the prosecution from turning over his records and any others of the witnesses. It has been established that several witnesses suffered from mental deficiencies and problems, such as Jason Bellini, a 15-year old 7th grade student; William Wright, a special education student; Robert Young, whose psychiatric school records were obtained by Petitioner's Freeport Sports Club (for liability insurance purposes, showing that Young had serious mental problems). The trial judge refused defense's request to introduce them into the record. Plainly, the prosecution was well aware of these records, especially considering the materials turned over to the District Attorney's Office by the FBI, which included MacFarland's and, at least, one other who had mental problems (T-1554). These witnesses lack the ability to perceive and recall events, as a prerequisite to providing accurate and truthful testimonies. And so, the prosecution strenuously rehearse them (T-462-463, 477, etal.), carrying through with its "Salem-styled Witch-hunt" against the Petitioner.

12

Here the failure to turn over clearly exculpatory **Brady** and **Rosario** materials substantially prejudiced the defendant/petitioner and adversely influenced the outcome of the trial. There is more than a reasonable probability that the jury would have returned a different verdict if the defense had been given witnesses' prior statements, psychological reports, and FBI records, all of which the prosecution had in its possession. Again, this is not a case where there is overwhelming evidence of defendant's guilt. As has been proved, when the defendant was given a fair chance to review and present evidence, defendant was found not guilty of nine counts. The materials withheld from the defense related directly to the critical issue of the veracity of the young witnesses, their credibility and the whereabouts of the defendant on the dates in question. Therefore, the withholding of exculpatory materials by the prosecution was misconduct and error of a constitutional dimension. The resulting conviction, sentencing and incarceration is illegal and the writ should be granted.

## GROUND II v. POINT II

Petitioner's Constitutional right to testify on his own behalf was impermissibly abridged by the state court's handling of the "Sandoval hearing. Even the Respondent, in Point II, stated that, "Generally (emphasis added), a claim that a state court abuse its discretion with respect to a Sandoval ruling does not present a federal constitutional issue. Citing Underwood v. Kelly and Jenkins v. Bara, the Respondent failed to note that those cases differed dramatically from this case. In the two cited cases, "The admission of prior convictions for the purpose of impeaching a defendant is thus not redressable in a federal habeas corpus proceeding unless there is a showing that the particular errors were of Constitutional magnitude." However, what "prior convictions" is the Respondent talking about? The Petitioner has an exemplary record in both his FBI and Army careers, as well as his community activities. Nowhere are there any allegations or charges, let alone convictions, for any bad acts or improprieties. In short, the Petitioner's right to testify was restricted and abridged by the court's misapplication of New York State's Sandoval rule. Without inquiring of the prosecution what uncharged bad acts he intended to confront defendant with if he testified, and without even balancing the probative worth of the evidence against prejudice, the court rejected defendant's application saying, "Well in every criminal trial every defendant is to one extent or another in harms way. Everything to some extent or another is prejudicial, everything depending on the jury. I find nothing with respect to any criminal, immoral or vicious acts in the cross-examination. Therefore, I am refusing and I'm denying your application. And you have an appropriate exception" (T-907,908).

14

The prosecution never revealed to the trial judge what it intended to use in its cross-examination of the defendant. Yet the trial judge remarkably claims he "...finds nothing with respect to any criminal, immoral or vicious acts in the cross-examination." Petitioner feel he is entitled to better consideration, especially in light of his dedicated service to this nation both in wartime combat and in peacetime law enforcement (*Faretta v. California*, 422 U.S. 806, 819 (1975); *Rock v. Arkansas*, 483 U.S. 44 (1987).

Even New York State Courts have held "As we read the record as a whole, we are compelled to conclude that the court did not exercise the requisite discretion. Its wholesale rejection of defendant's applications was not the result of as assessment of probative relevancy of each conviction or of its potential for impermissible prejudice or whether and to what extent each outweighed the other (see *People v. Davis*, 44 N.Y.2d 269 (1978) and *People v. Moore*, 156 A.D.2d 394 (2d Dept 1989), and *People Mitchell*, 618 N.Y.S.2d (2d Dept. 1984).

It is unnerving to note that the criminal defendants in the above cases had long histories of criminal behavior, arrests and convictions. Yet, their cases were reversed due to the judges' failures in exerting "the requisite discretion." Petitioner contends that it is patently unfair to place him below the law considering his exemplary governmental service records and his outstanding performance of duty, without any blemishes whatsoever.

Since it is a fundamental right of every defendant to testify, the Petitioner was denied this right by the trial court's incorrect *Sandoval* ruling (*People v. Rosen*, 81 N.Y.2d

15

237, 244. Considering that this case was extraordinarily difficult for the jury to absorb, involving many witnesses and complicated issues, some medical in nature, the background of the Petitioner and his testimony was critical.

Thus far, the Petitioner has not mentioned his background as an FBI Special Agent involved in Foreign Counter-Intelligence. Indeed, the trial court prevented any introduction or cross-examination of testifying FBI supervisors and special agents on the matter, citing the U.S. Government's claim that such involves "sensitive National Security issues" (see transcript from Judge Abbey Boklan's pre-trial held in October 1989, referred to as BT: BT-46, 63, 638-639). [If this court request the "Boklan transcripts", Petitioner or the Nassau District Attorney can furnish them. And the jury was quite concerned about this background, asking the trial judge during jury deliberations, "Is it possible to find out how this case came about?" (T-2797). Needless to say, the trial judge denied them that information.

The jury was left in the dark about the Federal Government's role in prosecuting the Petitioner. This information was partially disclosed by both the prosecution witnesses from the FBI (Supervisory Special Agents Carson Dunbar and Kenney) and the prosecution's medical team (Drs. Seigel and Kirwin) in their testimonies. Had the Petitioner been able to take the stand, he would have provided the jury with their answer.

[For the information of this Federal District Court (EDNY), the Petitioner has completed a 1400-page manuscript on his story,

16

providing extensive background details. In October 2001, Petitioner was interviewed by FBI agents concerning his knowledge of events leading to the September 11, 2001 World Trade Center disaster. The seeds of such terrorist problems were found in Petitioner's FBI cases as far back as 1984. FBI Legal Counsel & Special Agent Coleen Rowley (TIME Magazine's "Person-of-the-Year for 2002) also interviewed Petitioner here at Clinton C.F. regarding these matters. SA Rowley was also termed a "whistleblower" regarding her acknowledging Bureau misfeasance and improper investigations.]

Though Petitioner seeks a federal forum to expose these problems, he will concentrate on the grounds and points before this Court. However, it should be noted that the initial fallacious federal charges used against him was for misuse of a government credit card. That incident occurred only once in 1984 for a nine-dollar ($9) gasoline purchase to pursue an ongoing FBI investigation. And use of that credit card by Petitioner was authorized. Then in its effort to discredit or silence Petitioner as a whistleblower, false charges were leveled against him. This occurred on November 4, 1988, one week before the Presidential Election. SA Taus conducted sensitive FBI investigations into the Iraq-Contra Arms Initiative and Iraqi Arms Loans as briefly outlined in Petitioner's C.P.L. 440 Motion. (Petitioner's federal arrest occurred one week prior to the November 1988 Presidential Election.)

Whistleblowers who pointed out corruption in government (involving high-level officials and politicians) were handled severely back in the 1980s. Even today, such earnest people are

17

censured and the protection that is supposed to be afforded by the Whistleblower Protection act is mostly meaningless and intended for show (**Civil Service Reform Act of 1978**, Office of Special Counsel, **Contractor Whistleblower Protection Act of 1987** by Congresswoman Pat Shroeder (Col.).

The foregoing discussion demonstrates the depths of this case, the reasons for the prosecution as requested by the jury's note during deliberations and the trial prosecutor (ADA Littman) comment during the summation that, "No motive has been shown to falsely accuse him" (T-2603). Considering the application of the **Sandoval** rule to this case, the ruling prevented Petitioner from describing and explaining any of the events testified to by the complaining witnesses, despite the fact that none of these events were corroborated by their parents, clergy, doctors, etc.

Due to the court's adverse ruling, the Petitioner was not permitted to challenge the versions of events presented by the prosecution. The defense challenge to the prosecutor's case would have taken on greater significance if the jury had the opportunity to hear Petitioner testify as to the events surrounding the accusations. The trial court failed to properly exercise its discretion, failing to perform the constitutional analysis that is necessary when a defendant's right to testify is at stake. Petitioner was deprived of his right to testify in his own defense in violation of his Constitutional rights. For this reason, the writ should be granted.

## GROUND III v. POINT III

The Petitioner's Constitutional right to a fair trial was abridged by the trial court's continuous degradation of defense counsel. As provided in the Petitioner's Habeas Corpus Motion, and supported by the record, the trial judge strayed from neutrality in this case and intervene in such a manner and to such an extent as to cause the jury to be predispose to finding the petitioner guilty. A cursory reading of the judge's comments towards the defense plainly show an arrogant, abrupt and rude disposition toward defense and the Petitioner without any reasonable cause. Yet the effects were devastating for the Petitioner. The jury assumed the defendant was guilty and that the trial judge was merely going through the motions of a trial.

From the trial judge's august position, he bellowed out his instructions and directions, all carefully calculated to have the jury return a verdict of guilty. And that was what occurred Kennedy v. Los Angeles Police Dept., 901 P.2d 702, 709 (Ninth Cir. 1989); United States v. Harris, 501 P.2d 1, 10 (Ninth Cir. 1989) The trial transcripts abundantly reflect an "extremely high level of interference" by the trial judge that created "a pervasive climate of partiality and unfairness" (United States v. DeLuca, 692 F.2d 1277, 1282 (Ninth Cir. 1982). The verdict was reached the day prior to a National Holiday, Veterans' Day, an ignominious conclusion for the Petitioner who served in this nation's Army and wars for nearly twenty-years.

Obviously, the jury felt no need to be sequestered, nor delay a verdict since the trial judge had openly displayed his hostility to every efforts that the defense attorneys made. To

19

further support this conclusion, one has only to look at the Appellate Division's review of a case involving numerous exceptions, mistrial requests, and complicated issues. The Appellate Division hardly considered the matter and simply gave a sweeping denial to all of Petitioner's issues.

Though the Appellate Division did entertain arguments on the Sandoval issue, it ignored the other issues presented, including that of judicial misconduct or bias. That claim was preserved by defense. The Appellate Division's sweeping and concise opinion simply stated, "The defendant's remaining contentions are either unpreserved for appellate review, without merit, or constitute harmless error." Again, given the magnitude of the charges against the Petitioner, the strenuous trial defense and the high-profile nature of the case, the Appellate Judges failed to consider the issues presented without even the courtesy of pointing out which issues failed to met which criteria.

The very conduct of the trial and the judicial bias, misconduct and rude behavior of the trial judge, colored the 3000-page trial transcript. Quite interestingly, the Respondent qualifies herself as a "color-commentator" giving her views as to the trial judge's disposition, attitude and demeanor. Interesting, because Respondent attorneys were not at the trial at any time; yet, they impart physical behavior and conclusions as to what visually occurred. The Respondent has only the trial transcript to rely upon; unless of course, they spoke to the prosecuting ADA Kenneth Littman. Though that would be extreme conjecture considering that the august prosecutor resigned in disgrace after he solicited sex with a minor at the Nassau

20

Courthouse. Nor can any assumptions be made about a personal account of this trial from the trial judge, Edward Baker, who himself, took an early retirement in disgrace after other capricious and bias rulings (see Petitioner C.P.L. 440 Motion and Exhibits IV: Newsday, "Judge Reverses Himself," (August 13, 1993) and Exhibit V, Newsday, "Prosecutor Ousted," (November 5, 1993).

In Respondent's Answer at Point III, page 41, footnote 24, Respondent admits, "The only comments that might arguable be lauded derogatory were made out of the hearing of the jury (T.180-181, and T-1997. The Respondent proceeds to "color" every comment of the trial judge. A litany of implausible explanations follows in Respondent's Point III for nearly every contested comment made by the trial judge.

A further listing of what the Respondent describes as favorable rulings for the defense is noted at Point III, p.44. Regrettably, these mischaracterizations are exposed in each and every instance by the numerous exceptions taken, mistrial requests and a simple objective reading of the transcript record. For example, when the court granted requests for additional time to obtain witness, after the trial judge did all he could to delay them, the judge then refused to allow them to testify as previously noted in the first paragraph of this Memorandum of Law, under "Respondent's Affidavit."

What the prosecution could not introduce at trial has been introduced in Respondent's statements at Point III p.44. Therein, the Respondent mentions what can be termed uncharged

crimes, possible bad acts and other uncorroborated and unproven instances of a derogatory nature. Fraught with the Respondent's opinions as to the actual conduct of the trial judge, this Point (III) clearly does not correspond to a plainly objective reading and straight-forward interpretation of what occurred.

Here the trial was fundamentally unfair, from the very beginning, defendant was deprived of his rights to a fair trial and <u>effective assistance of counsel</u> by the trial judge's "deprecatory and often antagonistic attitude" toward defense counsel, <u>United States v. Dellinger</u>, 472 F.2d 340, 346 (Seventh Cir. 1972).

The judge's improper conduct, pervasive, repetitive degradations and debasement of defense counsels affected the result, insuring a conviction. Petitioner was deprive of his Constitutional rights to a fair trial and <u>the effective assistance of counsel.</u>

## PETITIONER'S POINTS IV, V, VI

### v.

### RESPONDENT'S POINT IV

In Petitioner's Habeas Corpus brief, Points IV, V and VI were separately addressed by references to the appendices attached thereto. These points noted that Petitioner's Constitutional right to a fair trial was denied as a result of Juror Misconduct (Point IV), Outrageous Governmental Conduct (Point V) and by Prosecutorial Misconduct (Point VI). Respondent consolidated these points under their own Point IV.

### Juror Misconduct.

The trial court erred in denying Petitioner's C.P.L. 330.30 Motion to set aside the verdict in light of juror(s) misconduct. Saying that those motion papers lacked the documentation required by the statute, the District Attorney's Office tried to obfuscate the actual papers submitted. As previously noted in this Memorandum of Law, under "Respondent's Affidavit," Juror Caroline Lewis submitted an affidavit as to juror misconduct which included the relationship between Juror Nancy Dillon and the District Attorney, Denis Dillon. According to Juror Lewis, Juror Nancy Dillon had informed her, as well as juror number six and perhaps other jurors, that she was related to Denis Dillon, the District Attorney (Lewis Affidavit at p.2). That affidavit was submitted with Petitioner's CPL 330.30 motion.

The Lewis Affidavit further averred that Juror Nancy Dillon met with Nassau Detective Doppman during the course of the trial

(Doppman was an investigator in the case against Petitioner and sat with ADA Littman during every day of the trial). Furthermore, Lewis asserted that contrary to the trial judge's instructions that, "each and every day of the trial, newspapers were brought into the jury room and read by members of the jury, particularly "Newsday" (Lewis Afd p.3). Said news stories cast the Petitioner in the worst light and appeared to be provided to the Press (Newsday) by an overbearing prosecution (Prosecutorial Misconduct). To counteract both the Lewis Affidavit and one submitted by defense counsel, ADA Littman solely offered his own affirmation that she said she was not related during the voir dire prior to trial. Troubling though that unproven comment may be, ADA Littman then asserted that he also asked DA Denis Dillon if he was related to her, and Littman related the DA "answered in the negative."

Without repeating the information contained in Petitioner's Appellate brief at Point IV, pp.52-61, Petitioner's present counselors strenuously submitted the matter without any relieve. Despite the proper documentation and proper procedures, neither the trial court nor the Appellate Division found merit on the issue raised by Petitioner's counsels. The Petitioner relies on the arguments raised in his extensive appellate brief, urging the Court to direct a new trial or alternatively to grant a hearing to resolve the issues raise in the CPL 330.30 motion.

In Respondent's attempts to justify the erroneous rulings by the trial court and appellate division, Respondent states in their Point IV at p. 47 (top), "Nor has he (Petitioner) made any colorable showing that he is actually innocent." Of course careless or, worse, disingenuous statements have harmful repercussions. Obviously, the Respondent failed to note that when given a chance to present evidence and alibi witnesses, the Petitioner/Defendant was acquitted of ten counts against him. That would appear to be more than "any colorable showing" as suggested by the Respondent. Again, it should be noted to this Court, that the Respondent consistently includes opinions, conjecture, improper characterization to color their viewpoint.

## Outrageous Governmental Conduct.

Petitioner emphasizes that the Government's actions in this case, both federal and state, were so outrageous that they "shocked the conscience." The Petitioner's due process rights under the state and federal constitutions were violated and, therefore, his conviction must be overturned and the indictment dismissed. The facts pertaining to this "ground" were partially covered in "Ground II v. Point II" where Petitioner noted the jury question, "Is it possible to find out how this case came about?" The implication concerned the revelations developed in Petitioner's official investigations involving government corruption, malfeasance, illegal activities and related scandals and coverups. More extensive coverage and explanations are provided in Petitioner's C.P.L. 440 Motion.

Since the Respondent chooses to say that "Petitioner's claim is based upon a delusional belief," it becomes apparent that Respondent is unaware or refuses to acknowledge that our federal government engaged in criminal activities and operations during the time that Petitioner was an FBI Special Agent. Many of Petitioner's FBI investigations discovered evidence of unauthorized and illegal operations involving high-level officials, business, governmental and organized crime leaders. The heart of a vast conspiracy involving the Iran-Contra Arms Initiative, the Iraqi Loans for Arms, and a host of other illegal activities were directed out of the Village of Freeport (as noted in The Washington City Paper issue of december 4, 1992, "The K-Team."

Prior to the revelations of these national scandals, Americans felt somewhat secure in their government's operations. More frequently, people working for the government, as well as private business, started exposing corrupt and unlawful practices. This was noted in Petitioner's Ground II concerning the Whistleblowers Act.

FBI records and files clearly show that Petitioner was a Special Agent assigned to the Foreign Counter-Intelligence Division and handling sensitive matters involving national security. After discovering criminal activities and operations sanctioned by government officials, the Petitioner tried to inform his FBI supervisor, FBI Director and Justice Department officials. FBI personnel are required to sign, biannually, an

"Acknowledgement Form" to the Congressional Intelligence Oversight Committees that they (FBI agents) know of no unreported criminal activities. With the magnitude of the secret criminal operation conducted in Freeport, Petitioner could not sign the declaration.

Instead, Petitioner wrote to members of the two Congressional Intelligence Oversight Committees about his official investigations. It would not be until the Nashington City Paper (Dec. 4. 1992) exposed the illegal operation that FBI SA Taus noted that he was finally able to tell his story.

And that story was partially related in Petitioner's C.P.L. 440 Motion. Perhaps, the foregoing discussion should have been included in an affidavit preceding this Memorandum of Law, but the discussion does truthfully answer the jury's question and explains the reason for Petitioner's claim of "Outrageous Government Conduct which both addresses the "K-Team's" ( (Washington City Paper), along with the coverups and the fallacious allegations and criminal indictment against the Petitioner.

Contained and preserved in the C.P.L. 440 Motion and the Appellate Division appeal is "The People's Brady violations" denying the Petitioner a fair trial (at Point IV, p.62-63). Not only did the trial Assistant District Attorney fail to turn over Brady materials related to the testifying witnesses, but

27

Petitioner never obtained the FBI reports and records specified that would show his official investigations, the coverups and the motivation for his unlawful removal. Even after FOIL requests were made, it took the FBI ten years to react. When the FBI finally provided 2400 pages concerning the Petitioner, those pages had either been so heavily redacted that they were meaningless or simply deleted with a deletion form in their place. Petitioner's Appellate brief (at p.62-63) explains these Brady violations which were conducted by both the FBI and Nassau County District Attorney's Office conspiring to end the law enforcement career, and investigations, of FBI SA Richard Taus. The withheld documents were Brady in nature and there existed more than "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different" United States v. Bagley, 473 U.S. 667, 682 (1985); Kyles v. Whitley, 514 U.S. 419, 433-434 (1995). And this rule makes no exception to materials held by the FBI or due to inadvertent nondisclosure United States v. Agurs, 427 U.S. 110, 96 S.Ct. 2392. The case presented against the Petitioner was the result of a Joint FBI/Nassau County District Attorney's Office.

For the above noted reasons, both the Outrageous Government Conduct, coupled with withholding exculpatory evidence, Petitioner's conviction, sentencing and incarceration is illegal and the writ must be granted.

## Prosecutorial Misconduct:

Prosecutorial misconduct deprived the Petitioner of a fair trial. The primary obligation of the District Attorney and his assistants is to see that justice is done and the rights of all individuals, including Petitioner, are safeguarded. The District Attorney is responsible for seeing that a fair trial is conducted (Berger v. United States, 295 U.S. 78 (1935). It is ironic that the prosecution pointed out in his opening statement that in some way the Petitioner posed a threat to the witnesses since he possessed guns. The same notion could, and perhaps should have been applied to the investigating police officers and FBI agents that bullied and coerced the young witnesses. Apart from Petitioner's career positions, both as a law enforcement officer and an Army Colonel, there never had been any concern about the safety of others. All of the Petitioner's life had been in service to this nation and never, including during the events leading up to the trial and subsequently had anyone been threatened by the Petitioner. From the witnesses own mouths, during cross-examination, came the shocking discovery that the police detectives, investigating the case, had coerced the young witnesses.

Indeed, the Petitioner avers that many of the witnesses families were also coerced by threats of prosecution for their own parental abuse and neglect. This fact was discovered during the trial when the defense asked to call upon several of the witnesses' parents. One, Doreen Bellini, mother of Witness Jason, sent a letter saying she had been threatened by the Nassau Detectives and was too intimidated to testify. How then, did the

29

petitioner receive a fair trial? Even the witnesss who wanted to testify for the Petitioner were refuse by the trial judge (see reply to Respondent's Affidavit, p.2, 3 supra.).

ADA opening statement and his closing statements were fallacious, slanderous and beneath the dignity of his office, and certainly without merit or justification.

It also was evident from Juror Caroline Lewis' affidavit that ADA Littman did not abide by the rules and code of his office when he engaged in meetings with Juror Nancy Dillon during the trial. ADA Littman never acknowleged such meeting as he should have. This goes to the moral fabric of the person who later had to resign in disgrace from his entrusted position. The Assistant District Attorney had solicited sex, in the Courthouse, with a minor who was a witness in another trial (__Newsday__, "Prosecutor Ousted," Nov.5, 1993).

The Respondent claims that several of the prosecution's statement, especially the allegation that petitioner had been federally charged (misuse of a government credit card), were subsequently stricken from the record. Still, the damage had been done. The jury heard these unfounded castigations which served their prosecutorial designs, to slander the Petitioner before the eyes of the jury.

The federal cases cited by the Respondent, which dealt with subsequently-stricken statements concerned facts that did not apply to Petitioner's case. In __Jameson v. Wainwright__, 719 F.2d

1125-27 (11th Cir. 1983); **Mitchell v. Smith**, 481 F.Supp. 22, 25 (EDNY 1979) involved instances where there were no detrimental impacts upon the fairness of the trial. Here, such disingenuous statements added fuel to the conflagration created in a case that had all the tapestry and color of a "Salem-styled Witchhunt."

Prior to and during the trial, ADA Littman provided the news media with slanderous information designed to inflame the community (also see Petitioner's Appellate brief, Point V at p.53 which concerns the outrageous newspaper headlines). ADA Littman was called to task on these matters by the defense during the trial. One such newspaper article was from information that could only come from the District Attorney's Office.

Though many of the prosecutor's intemperate remarks were objected to, forming the basis for several mistrial application, the trial judge did nothing to remedy the situation. No mistrial was granted. Despite all these "inflammatory asides," the trial judge allowed ADA Littman to insinuate, suggest and speculate about matters clearly outside the record, all designed to discredit the Petitioner and ensure his conviction.

Judicial Misconduct, if not simple apathy, allowed the prosecution to made his improper remarks throughout the trial. There were no curative instructions; and in spite of Respondent's suggestion that the trial judge was even-handed, the record shows

31

otherwise. The Court's conduct substantially increased the prejudicial effects of the prosecutorial misconduct, making the trial unfair, depriving the Petitioner of his Constitutional rights. For the foregoing reasons, the writ should be granted, reversing the conviction and releasing the Petitioner.

## CONCLUSION

WHEREFORE, the undersigned Petitioner, prays that the application for a writ of habeas corpus be granted and the judgment of conviction be vacated in its entirety, the indictments dismissed or, in the alternative, a new trial granted and for such other an further relief as this Court deems just and proper.

DATE: November 17, 2003
      Dannemora, New York

Yours, etc.

*Richard Taus*

Richard Taus 91A1040
Petitioner, Pro Se
Clinton Correctional Facility
Dannemora, New York 12929

I declare under the penalty of perjury that the foregoing is true and correct. Executed this 17th day of November 2003 at the Clinton Correctional Facility, Dannemora, New York in the County of Clinton.

*Richard Taus*

Richard Taus