UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

RICHARD TAUS (91-A-1040),

      Petitioner,

  – against --

DANIEL SENKOWSKI, Superintendent of
Clinton Correctional Facility,

     Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

      MEMORANDUM,
      JUDGMENT & ORDER
      02-CV-4492 (JBW)
      03-MISC-0066 (JBW)

JACK B. WEINSTEIN, Senior District Judge:

  This matter involves a conviction for the serial sexual abuse of minors. In general, such cases present special problems concerning the susceptibility of young complainants to suggestive questioning and false memories. Also to be considered is the possibility of community hysteria sparked by law-enforcement investigation into the crimes. The Court of Appeals for the Second Circuit and this court have recognized that matters involving the sexual abuse of children are a special class of case requiring special protections—beginning at the investigatory stage, continuing through trial and appeal, and persisting in a habeas corpus proceeding. These cases require particular scrutiny, notwithstanding that the same rules apply to this class of cases as to all others. *See, e.g., Lindstadt v. Keane*, 239 F.3d 191 (2d Cir. 2001); *Eze v. Senkowski*, 321 F.3d 110 (2d Cir. 2003); *Jelinek v. Costello*, 247 F. Supp. 2d 212 (E.D.N.Y. 2003) (all addressing the special problems arising in child sexual abuse cases).

  A hearing was held in this matter. Petitioner was present by telephone and counsel for petitioner was present in person. The petition for a writ of habeas corpus is denied for the



reasons stated orally on the record. This memorandum briefly addresses petitioner's claims.

I. Facts and Procedural History

Petitioner, formerly a member of the Federal Bureau of Investigation, was convicted in 1990, after a jury trial, of numerous crimes relating to the sexual abuse of a number of boys, aged six to thirteen years old at the time of the abuse. Evidence of petitioner's guilt of the crimes of conviction was overwhelming. It included his oral and written confessions to abusing five of the boys, testimony from the complainants, and lewd photographs of some of the boys taken by petitioner and found in his home. It is unnecessary to detail the numerous incidents of abuse testified to at trial. They included fondling of the penis and oral and anal sodomy, much of it at petitioner's home.

In his defense, petitioner presented several character witnesses at trial, who in sum testified that petitioner was a distinguished Vietnam War veteran who had adopted a Vietnamese orphan and who was something of a surrogate father for a number of boys in the neighborhood. In support of an affirmative defense that petitioner suffered from a mental disease or defect at the time of the commission of the abuse, psychiatrist testified that petitioner was schizophrenic. In addition, three psychologists opined that petitioner was suffering from Post-Traumatic Stress Disorder (PTSD) as a result of his service in Vietnam and that he was likely in a disassociative state when he committed the sexual abuse (which occurred between 1984 and 1988).

In rebuttal, the prosecution presented testimony from its own psychiatric experts, who concluded that petitioner was aware of and appreciated the wrongfulness of his acts. To disprove the affirmative defense that petitioner was suffering from PTSD, a 36-year old man testified that when he was 8- or 9-years old and petitioner was an 18-year old camp counselor, he was sexually

abused by petitioner.

Petitioner was acquitted of a number of the charges made against him but was convicted of sodomy in the first degree (three counts), sodomy in the second degree, sodomy in the third degree, sexual abuse in the first degree (eight counts), sexual abuse in the second degree (three counts), and promoting an obscene sexual performance by a child (three counts). He was sentenced to 30-1/3 to 92 years in prison.

Prior to filing a direct appeal, petitioner moved to vacate judgment, alleging, *inter alia*, that he had newly discovered evidence. The motion was denied by the trial court. Leave to appeal the denial was granted by the Appellate Division, which ordered the appeal from the order denying the motion be consolidated with petitioner's pending direct appeal from the judgment of conviction. Subsequently, the Appellate Division affirmed petitioner conviction and the order denying his motion to vacate the judgment of conviction. Leave to appeal to the New York Court of Appeals was denied. Petitioner, acting *pro se*, sought leave of the New York Court of Appeals to reconsider his application for leave to appeal. Upon reconsideration, leave to appeal was again denied.

In his application for a writ of habeas corpus, petitioner claims that (1) the prosecution failed to disclose to the defense *Brady* material; (2) his right to testify was abridged; (3) his right to a fair trial and effective assistance of counsel were denied by the trial court's "persistent confrontations with & denigrations of Defense Counsel"; (4) his conviction was obtained by juror misconduct and improper influence; (5) the "government's actions in this case were so outrageous that they 'shock the conscience'"; and (6) prosecutorial misconduct denied him a fair trial.

3

II. AEDPA

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

An "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a federal claim." *Sellan v. Kuhlman*, 261 F.3d 303, 313 (2d Cir. 2001) (quoting *Aycox v. Lytle*, 196 F.3d 1174, 1178 (10th Cir. 1999)). Under the "contrary to" clause, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000) (O'Connor, J., concurring and writing for the majority in this part). Under the "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. In order to grant the writ there must be "some increment of incorrectness beyond error," although

4

"the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted).

"[F]ederal law, as determined by the Supreme Court, may as much be a generalized standard that must be followed, as a bright-line rule designed to effectuate such a standard in a particular context." *Overton v. Newton*, 295 F.3d 270, 278 (2d Cir. 2002); *see also Yung v. Walker*, No. 01-2299, 2002 U.S. App. LEXIS 28137 (2d Cir. Aug. 1, 2003) (amended opinion) (district court's habeas decision that relied on precedent from the Court of Appeals is remanded for reconsideration in light of "the more general teachings" of Supreme Court decisions). The Court of Appeals for the Second Circuit has also indicated that habeas relief may be granted if a state court's decision was contrary to or an unreasonable application of "a reasonable extension" of Supreme Court jurisprudence. *Torres v. Berbary*, No. 02-2463, 2003 U.S. App. LEXIS 16167, at \*25 (2d Cir. Aug. 7, 2003). Determination of factual issues made by a state court "shall be presumed to be correct," and the applicant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

III. Exhaustion

In the past, a state prisoner's federal habeas petition had to be dismissed if the prisoner did not exhaust available state remedies as to any of his federal claims. *See Rose v. Lundy*, 455 U.S. 509, 522 (1989). "This exhaustion requirement is . . . grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights." *Coleman v. Thompson*, 501 U.S. 722, 731 (1991). The exhaustion requirement requires the petitioner to have presented to the state court

"both the factual and legal premises of the claim he asserts in federal court." *Daye v. Attorney General*, 696 F.2d 186, 191 (2d Cir. 1982) (en banc).

Pursuant to AEDPA, a district court may now, in its discretion, *deny* on the merits habeas petitions containing unexhausted claims—so-called "mixed petitions." *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state."). In addition, the state may waive the exhaustion requirement, but a "State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." *Id.* § 2254(b)(3); *see also Ramos v. Keane*, No. 98 CIV. 1604, 2000 U.S. Dist. LEXIS 101, at *10 (S.D.N.Y. 2000) (state's failure to raise exhaustion requirement does not waive the issue).

IV. Procedural Bar

A federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. In determining whether a procedural bar is sufficient to preclude habeas review, a federal court must consider as "guideposts" the following:

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule given "the realities of trial,"

6

> and, therefore, whether demanding perfect compliance with the rule would serve a
> legitimate governmental interest.

*Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003) (quoting *Lee v. Kemna*, 534 U.S. 362 (2002)).

If a state court holding contains a plain statement that a claim is procedurally barred then

the federal habeas court may not review it, even if the state court also rejected the claim on the

merits in the alternative. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989) ("a state court need

not fear reaching the merits of a federal claim in an *alternative* holding" so long as it explicitly

invokes a state procedural rule as a separate basis for its decision).

When a state court says that a claim is "not preserved for appellate review" and then rules

"in any event" on the merits, such a claim is not preserved. *See Glenn v. Bartlett*, 98 F.3d 721,

724–25 (2d Cir. 1996). When a state court "uses language such as 'the defendant's remaining

contentions are either unpreserved for appellate review or without merit,' the validity of the

claim is preserved and is subject to federal review." *Fama v. Comm'r of Corr. Svcs.*, 235 F.3d

804, 810 (2d Cir. 2000). Where "a state court's ruling does not make clear whether a claim was

rejected for procedural or substantive reasons and where the record does not otherwise preclude

the possibility that the claim was denied on procedural grounds, AEDPA deference is not given,

because we cannot say that the state court's decision was on the merits." *Su v. Filion*, No. 02-

2683, 2003 U.S. App. LEXIS 13949 at *15 n.3 (2d Cir. July 11, 2003) (citing *Miranda v.

Bennett*, 322 F.3d 171, 178 (2d Cir. 2003)). This congeries of holdings leaves it an open

question whether there are "situations in which, because of uncertainty as to what the state courts

have held, no procedural bar exists and yet no AEDPA deference is required." *Id.*

V. Certificate of Appealability

A certificate of appealability may be granted with respect to any one of petitioner's claims only if petitioner can make a substantial showing of the denial of a constitutional right. **Petitioner has a right to seek a certificate of appealability from the Court of Appeals for the Second Circuit.** *See* 28 U.S.C. § 2253; *Miller-El v. Cockrell*, 123 S.Ct. 1029 (2003). The court has taken into account the rule of section 2253(c)(3) of Title 28 of the United States Code that a certificate of appealability "shall indicate which specific issue or issues satisfy the [substantial showing of the denial of a constitutional right] required by paragraph (2)." *See also Shabazz v. Artuz*, No. 02-2320, 2003 U.S. App. LEXIS 14450, at \*15 (2d Cir. July 18, 2003).

This opinion complies with *Miranda v. Bennett*, 322 F.3d. 171, 175–77 (2d Cir. 2003), and Rule 52 of the Federal Rules of Civil Procedure. No other issue open to consideration by this court has merit. *See Sumner v. Mata*, 449 U.S. 539, 548 (1981) ("a court need not elaborate or give reasons for rejecting claims which it regards as frivolous or totally without merit").

VI. Analysis of Claims

It appears that at least one of petitioner's claims (based on *Brady* violations) is unexhausted and that another was defaulted in state court on a procedural ground. Because all of petitioner's claims are meritless, this court exercises its statutory discretion to consider each issue raised. Unless otherwise noted below, all claims are reviewed under a *de novo* standard.

A

Petitioner first claims that the prosecution failed to disclose to the defense certain *Brady* material. He specifically references and appends to his petition only one document, the notes from an F.B.I. agent's interview with the mother of one of the complainants, R.O. In the three-

8

page document, the mother of a complainant is reported to have said that she "confronted" her son with "the suggestion of a homosexual relationship" with petitioner but that her son "adamantly denied anything improper." Sept. 2, 1988 F.B.I. Report at 3. In addition, petitioner gestures generally toward "areas" in which the defense was denied exculpatory material, but without identifying particular documents he alleges to be exculpatory or the reason for their materiality. *See, e.g.*, Petitioner's Habeas Memo. at 9 ("Yet another area in which the defense was denied exculpatory material is the persistent denial of access to records relating to the inability of certain witnesses to perceive, recall and relate events."). The reason for petitioner's lack of specificity is presumably that petitioner has never in fact been in possession of these documents.

The prosecution in a criminal matter has a constitutional obligation to disclose exculpatory evidence to the defendant. *See Brady v. Maryland*, 373 U.S. 83 (1967), *Giglio v. United States*, 405 U.S. 150 (1972). "A finding of materiality of the evidence is required under *Brady*." *Giglio v. United States*, 405 U.S. 150, 154 (1972). Exculpatory evidence is considered material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Nondisclosure merits relief only if the prosecution's failure "'undermines confidence in the outcome of the trial.'" *Kyles v. Whitly*, 514 U.S. 419, 434 (1995) (quoting *Bagley*, 473 U.S. at 678). The Supreme Court has rejected any distinction between impeachment evidence and exculpatory evidence. *See Bagley*, 473 U.S. at 676. Impeachment evidence "is 'evidence favorable to an accused,' *Brady*, 373 U.S. at 87, so that, if disclosed and used effectively, it may make the difference between conviction

9

and acquittal." *Id.* The "individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." *Kyles,* 514 U.S. at 437; *see also Pennsylvania v. Ritchie,* 480 U.S. 39 (1987) (assuming that state child protective agency files could be *Brady* material).

With respect to the F.B.I. report of the mother of R.O., this court credits the testimony of respondent's attorney, who stated at an evidentiary hearing before this court that the Nassau County District Attorney's Office was never in possession of the report at the time of petitioner's trial and that the report was turned over to the defense when it came into the possession of the office, during appellate proceedings nearly ten years after trial.

Knowledge of exculpatory information possessed by a government agency may, under some circumstances, be imputed to the prosecution in a criminal trial. *See, e.g., Kyles v. Whitley,* 514 U.S. 419, 421 (1995) (exculpatory material in possession of the police is imputed to the prosecution). Ordinarily, knowledge is imputed to the prosecution because it is in the best position to assure the cooperation of and full disclosure from a coordinate executive agency:

> [N]either is there any serious doubt that "procedures and regulations can be established to carry [the prosecutor's] burden and to insure communication of all relevant information on each case to every lawyer who deals with it." *Giglio v. United States,* 405 U.S. 150, 154 (1972). Since, then, the prosecutor has the means to discharge the government's *Brady* responsibility if he will, any argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials.

*Kyles,* 514 U.S. at 508–09 (parallel citations omitted).

Under the circumstances of the instant case, the district attorney's office cannot be deemed to have been in the constructive possession of the September 2, 1988 F.B.I. report, nor is

10

it appropriate to impute knowledge of the contents of the report to that office. Unlike a county police department, the Federal Bureau of Investigation is an independent, federal government agency with a strong sense of its autonomy and need to protect—for national security and other reasons—its own documentation. The investigation it launched with respect to petitioner was an internal disciplinary inquiry. Criminal prosecution of petitioner was left to state authorities, who, according to the credible testimony of counsel for respondent, had a relatively difficult time retrieving documents from the F.B.I.

Were a joint investigation and prosecutorial enterprise engaged in by the F.B.I. and a district attorney's office, it might be appropriate to impute knowledge of all F.B.I. reports to a state prosecutor on some form of "silver platter" theory. Since such cooperation did not exist in the instant matter—the federal administrative inquiry on the wrongdoing of one of its employees and the state criminal investigation and prosecution having proceeded quite independently—that legal issue need not now be resolved. Because the prosecution was not in possession of any of these reports, did not know have independent knowledge of their existence, and could not produce them to the defense, there was no *Brady* violation.

In addition, there is no reason to believe that the defense was in any worse position than the district attorney's office to know of and request the elusive report from the F.B.I. petitioner now relies upon as a basis for his *Brady* claim. A subpoena could have been issued by either party, but apparently was not. Whether or not the F.B.I. would have honored a subpoena cannot be known. A federal Freedom of Information Act request might have been made by either side; it was not made.

The failure of the trial court to assist petitioner in obtaining the report is to be ascribed in

11

large part to the defense, which argued that the report was discoverable as *Rosario* material (*i.e.*, as a pretrial statement of a witness who would be called to testify on behalf of the prosecution) rather than as *Brady* material. Cast in *Rosario* terms, the trial court's conclusion that the report need not be produced was appropriate. *See* Trial Tr. at 1580–93. To the extent defense counsel was seeking the material for other than *Rosario* purposes, he should have made his position clearer to the court. Discussion with the court by defense counsel at trial seems to suggest that defense counsel had better access to F.B.I. files than did the prosecutor. This is not surprising, since defense counsel had wide experience in this court on federal cases involving F.B.I. reports.

At any rate, the September 2, 1988 F.B.I. report would have been of little to no value to petitioner if he possessed it at trial. The isolated statement that he relies upon—that R.O. "adamantly denied anything improper" when confronted by his mother with the "suggestion of a homosexual relationship with [petitioner]"—is located within a paragraph detailing the speculation of neighbors, relations and friends that petitioner's relationship with the boy "was not proper":

> With regard to the specific nature of the relationship between [R.O.] and [petitioner], Moore [R.O.'s mother] advised that she herself never saw or was told anything specific by [R.O.] that indicated anything of a "homosexual" nature. Moore stated, however, that other people did suggest to her that something may be wrong. By way of examples, Moore stated that the pastor of the church she attended in New York, Reverend Robert Dawley, became aware of the relationship between [petitioner] and [R.O.] in terms of the amount of time that they were spending together and under what circumstances and suggest that the relationship was not proper or healthy. Moore advised that initially she was somewhat upset that Reverend Dawley would conduct his own "investigation" of the relationship between [petitioner] and [R.O.], but in the end she understood that the counsel Reverend Dawley was providing to her was based on his concern for her family. Moore advised that when she confronted [R.O.] with the suggestion of a homosexual relationship with [petitioner] he adamantly denied anything improper. Moore stated that the discussions she had with [R.O.]

12

regarding this subject matter were very emotional and difficult for her to deal with
as a single parent. Moore advised also that her sister, who lives in Puerto Rico,
and spent time with them during various vacation periods, also suggested to her
that [petitioner] was a homosexual. Moore advised her sister, Mercedes Pagan . . .
never advised her that she saw anything specific between [petitioner] and [R.O.]
that would predicate this conclusion.

Sept. 2, 1988 F.B.I. Report at 3.

The report would have been of minimal use to an experienced defense attorney. The
mother of R.O. was not a witness at trial. She lived in Colorado and apparently was never
contacted by petitioner's counsel even though counsel seemed to be well aware that she had
spoken with an F.B.I. agent. The only way the document could have been used at trial would
have been if R.O. were asked whether he had ever denied to his mother that petitioner had
sexually abused him—a dangerous proposition that a defense attorney might well have avoided.
R.O. could have answered that he had denied allegations of abuse, in which case the document
could not be used by defense counsel. Such a concession by the boy would not, as petitioner
argues in this habeas proceeding, have been a great boon to the defense. Jurors would have
understood—or it would have been suggested to them by the prosecutor—that initial denials by a
victim of sexual abuse to a parent are not uncommon. R.O. could, alternatively, have stated that
he either did not recall making such a denial or that he had not in fact made any such denial. The
report could then have been offered to him to refresh his memory, but that would be the end of its
proper use during trial.

Relief is appropriate only if the failure of the prosecution to have produced the F.B.I.
report to petitioner undermines its confidence in the outcome of the trial (at least with respect to
the crimes allegedly committed against R.O.). There is no reasonable probability that petitioner

13

would have been exonerated of the counts for which he was convicted relating to R.O. if he had been supplied with this document. The complainant's testimony at trial was credible and was buttressed by petitioner's own oral and written confession admitting to having engaged in a "relation [that] involved sexual activity for a period of four years" with R.O. Petitioner's Statement at 1 (appended to Respondent's Aff. & Memo. of Law). That the complainant had at one time denied allegations of abuse is, standing alone under these circumstances, of trifling importance. One of the two counts for which petitioner was convicted with respect to R.O., for instance, accused him of promoting an obscene performance by a child, proof of which was the discovery in petitioner's briefcase of an obscene photography of R.O. Habeas corpus relief is not warranted on this *Brady* claim.

Petitioner's remaining, generalized assertions of violations of *Brady* cannot be evaluated without review of the allegedly exculpatory documents themselves. Neither petitioner nor respondent is in possession of these documents. Should petitioner come into possession of exculpatory documents through a Freedom of Information Law request or by other means, he may seek permission from the Court of Appeals for the Second Circuit to file a "second or successive" habeas application. *See* 28 U.S.C. § 2254(b)(2) ("A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless . . . the factual predicate for the claim could not have been discovered previously through the exercise of due diligence."). Except with respect to the F.B.I. Report discussed above, petitioner cannot be deemed to have alleged any further *Brady* violation in the instant habeas application.

14

B

Petitioner next claims that his right to testify was abridged. The trial court did not, however, prevent him from testifying. Rather, the court ruled that if petitioner chose to testify, the prosecution could question petitioner about prior bad acts.

Because he did not testify at trial, this claim is not cognizable on habeas review. *See Luce v. United States*, 469 U.S. 38, 43 (1984) ("to raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant must testify"); *Grace v. Artuz*, No. 00-CV-1441, 2003 U.S. Dist. LEXIS 6969, at *26 (E.D.N.Y. Apr. 22, 2003) ("petitioner's claim as to the impropriety of the *Sandoval* ruling does not raise a constitutional issue cognizable on habeas review").

C

Petitioner claims that his right to a fair trial and effective assistance of counsel were denied by the trial court's "persistent confrontations with & denigrations of Defense Counsel." Although petitioner's habeas attorney couches this claim in terms of ineffective assistance of counsel, he alleges no deficiency in trial counsel's performance. Properly stated, the claim is that the trial court's behavior during the proceedings denied petitioner a fair trial.

Pursuant to the Fifth and Fourteenth Amendments, all criminal trials must be conducted within the bounds of fundamental fairness. *See Taylor v. Hayes*, 418 U.S. 488, 501–02 (1974). The bias of a trial judge

> creates a risk that the jury will be deflected from a conscientious discharge of their responsibility to find the facts, apply the law, and reach a fair verdict. The jurors may believe that they should shade their judgment to accommodate the judge's view of the defendant's guilt, perhaps deferring to his view in a close case. Second, even if the jurors are not swayed from an independent discharge of their

15

solemn responsibilities, the judge's [action] creates a risk that the trial will not be
perceived by the defendant or the public as a fair adjudication of guilt or
innocence, presided over by a neutral magistrate obliged to deal even-handedly
between the contending forces of the prosecution and the defense.

*Gayle v. Scully*, 779 F.2d 802, 806 (2d Cir. 1985) (quoting *Daye*, 696 F.2d at 1571–72).

A "judge's intervention in the conduct of a trial must be both significant and adverse to

the defense 'to a substantial degree before the risk of either impaired functioning of the jury or

lack of the appearance of a neutral judge conducting a fair trial exceeds constitutional limits.'

Thus, a petitioner claiming that a judge's bias deprived him of a fair trial faces a difficult task."

*Id.* (quoting *Daye*, 696 F.2d at 1572).

Petitioner devotes more than a dozen pages to detailing alleged incidents of bias by the

trial court. *See* Habeas Memo. at 32–45. The commentary to which petitioner objects need not

be repeated here. Most of it is innocuous and consists of little more than the court's urging

defense counsel to proceed more expeditiously, with less repetition, in a more focused manner,

and properly under the rules of evidence. Although the court was clearly exasperated at times

with defense counsel's behavior and with the bickering between counsel, no reasonable juror

would have concluded that the judge was not a neutral referee.

It is not the role of a federal habeas court to supervise the conduct of state court judges.

Petitioner was not denied a fair trial by the occasional comments and questions of the trial court.

Habeas corpus relief on this claim is not warranted.

D

Petitioner claims that his conviction was obtained by juror misconduct and improper

influence. He first raised this claim prior to sentencing, in a motion before the trial court to set

16

aside the verdict. *See* N.Y. Crim. Pro. L. § 330.30. In support of that motion, he submitted an affidavit from one of the jurors stating:  (1) that another juror, Nancy Dillon, was related to Nassau County District Attorney Dennis Dillon but failed to reveal this fact to the court; (2) that Ms. Dillon told her and other jurors that during the trial she met and spoke to one of the detectives who had testified in the case at a karate class; and (3) that newspapers were brought into the jury room on each day of the trial, with articles about the case.

In response to the motion, the prosecutor submitted an affidavit stating that he asked Ms. Dillon during *voir dire* whether she was related to Dennis Dillon and she said she was not, and that Dennis Dillon, when queried, likewise denied any relation. The prosecutor also noted that Ms. Dillon did not supply an affidavit in support of petitioner's application.

The trial court denied petitioner's motion, noting among other things that the complaining juror was "obviously disgruntled" and had an "apparent animosity for" Ms. Dillon, that Ms. Dillon denied on a juror questionnaire under penalty of law that she was related to anyone in law enforcement, that none of the other jurors had complained about any inappropriate behavior, and that in the absence of an allegation that any of the jurors (including the complaining juror) had actually read the newspaper articles about the trial, the court would assume that the jurors followed his instruction not to.

When petitioner raised this claim on direct appeal, the Appellate Division rejected it on procedural grounds, stating, "The defendant's motion to set aside the jury verdict was properly denied without a hearing, since it was not supported by an affidavit of someone with personal knowledge of the facts essential to support the demand for the relief requested." *People v. Taus*, 719 N.Y.S.2d 897 (App. Div. 2001). The procedural bar is adequate under the present

17

circumstances to prevent federal review of the claim. As there would be no miscarriage of

justice if this court refused to entertain it on the merits, further consideration of the claim in this

court is precluded.

Moreover, the procedural bar invoked by the Appellate Division is, in the instant case,

one that deserves to be respected by this court on more than comity grounds. The failure of

petitioner either in the state court or in this federal court to support his claims with a sworn

statement from Ms. Dillon provides only an attenuated foundation for relief. The trial court's

observation that the complaining juror was disgruntled and possessed animus toward Ms. Dillon

is not to be lightly discounted. Reliance cannot be placed on the complaining juror's affidavit

alone. There is, in addition, no evidence that Ms. Dillon spoke with the detective about the case

or that any of the jurors read any of the newspaper articles about the case. Habeas corpus relief

on this claim is not warranted.

E

Petitioner claims that the "government's actions in this case were so outrageous that they

'shock the conscience'" and denied him a fair trial. In particular, he alleges that his prosecution

for sodomy is a conspiracy by the federal and state governments, aimed at petitioner because he

was too knowledgeable about "several sensitive national security cases." Br. & App. for

Defendant-Appellant at 61. He claims, through counsel, that

> the government, both Federal (FBI) and state (Nassau County District Attorney
> and police) conspired to end the law enforcement career and freedom of
> [petitioner]. By manipulating a group of retarded children and scaring their
> parents, these groups, acting in concert, were able to achieve their ends. To
> accomplish this, the FBI withheld, to this day, various documents that would have
> cast a serious doubt on the state prosecution. It is uncontroverted that [petitioner]
> was working on foreign counter-intelligence matters. It is also uncontroverted

18

that a secret CIA cabal was operating out of Freeport, N.Y.

*Id.* at 63.

Petitioner may or may not have been in possession of damning information concerning government actors and the Iran-Contra affair, as is suggested in his court papers. *See, e.g., id.* at 66. He may or may not be delusional and paranoid. Counsels' reiteration of petitioner's conspiracy claims in the state and federal courts suggests that counsel, at least, consider the claims not to be totally frivolous. Petitioner has failed, nonetheless, to present any evidence to this court of "outrageous" government conduct that denied him a fair trial. His complaints of alleged *Brady* violations were addressed above. His claim that the F.B.I. was out to get him and investigated him in order to keep him quiet does not state a cognizable claim in this habeas proceeding. That the F.B.I. deployed a "ruse" to draw him from his home (when investigators on a stakeout witnessed a child enter) has no bearing on the instant case.

Habeas corpus relief is not warranted on this claim.

F

Finally, petitioner claims that prosecutorial misconduct denied him a fair trial.

Ordinarily, a prosecutor's misconduct will require reversal of a state court conviction only where it sufficiently infected the trial so as to make it fundamentally unfair, and, therefore, a denial of due process. *Donnelly v. DeChristoforo*, 416 U.S. 637, 645 (1974). Nonetheless, "when the impropriety complained of effectively deprived the defendant of a specific constitutional right, a habeas claim may be established without requiring proof that the entire trial was thereby rendered fundamentally unfair." *Mahorney v. Wallman*, 917 F.2d 469, 472 (10th Cir. 1990) (citing *DeChristoforo*, 416 U.S. at 643). Inquiry into the fundamental fairness of a

19

trial requires an examination of the effect of any misconduct within the context of the entire proceedings. *DeChristoforo*, 416 U.S. at 643. In order to view any prosecutorial misconduct in context, "we look first at the strength of the evidence against the defendant and decide whether the prosecutor's statements plausibly could have tipped the scales in favor of the prosecution. . . . Ultimately, we must consider the probable effect the prosecutor's [statements] would have on the jury's ability to judge the evidence fairly." *Fero v. Kerby*, 39 F.3d 1462, 1474 (10th Cir. 1994) (quotations omitted).

The allegedly improper remarks by the prosecutor are trifles, such as the "constant" reference to petitioner's behavior toward the complainants as "seduction." A stray reference to an uncharged crime was corrected with an instruction to the jury. Counsel objected to few of the remaining allegedly improper remarks in a timely fashion. To the degree the prosecutor was at all arguably intemperate in his comments, petitioner was not denied a fundamentally fair trial as a result. Habeas corpus relief on this claim is not warranted.

VII. Conclusion

The petition for a writ of habeas corpus is denied.

A certificate of appealability is granted solely with respect to petitioner's claim that juror misconduct denied petitioner a fair trial and that the procedural bar invoked by the Appellate Division was not adequate to bar federal review under the instant circumstances.

No certificate of appealability is granted with respect to any of petitioner's remaining claims, petitioner having made no substantial showing of the denial of a constitutional right. A further certificate may be sought from the Court of Appeals for the Second Circuit.

SO ORDERED.

Jack B. Weinstein
Senior District Judge

Dated:        November 26, 2003
              Brooklyn, NY